**Slip Op. 26-111**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V.,**<br><br>**Plaintiffs,**<br><br>**and**<br><br>**PERFILES LM, S.A. DE C.V.,**<br><br>**Consolidated Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**NUCOR TUBULAR PRODUCTS INC.,**<br><br>**Defendant-Intervenor.** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Consol. Court No. 23-00091** |

**OPINION AND ORDER**

[Sustaining the U.S. Department of Commerce's Second Remand Redetermination.]

Dated: September 14, 2026

Diana Dimitriuc Quaia, John M. Gurley, Tyler J. Kimberly, ArentFox Schiff LLP, of Washington, D.C., and Yun Gao, ArentFox Schiff LLP, of New York, N.Y., for

Plaintiffs Maquilacero S.A. de C.V. and Tecnicas De Fluidos S.A. de C.V.

Jeffrey M. Winton, Michael J. Chapman, Amrietha Nellan, and Vi N. Mai, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff Perfiles LM, S.A. de C.V. Also on the brief was Rachel Hauser.

Kristin E. Olson, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Karl Mueller, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Alan H. Price, Robert E. DeFrancesco, III, and Kimberly A. Reynolds, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor Nucor Tubular Products Inc.

Choe-Groves, Judge: This action concerns the final determination published by the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping duty order on light-walled rectangular pipe and tube from Mexico. See Light-Walled Rectangular Pipe and Tube from Mexico ("Final Results"), 88 Fed. Reg. 15,665 (Dep't of Commerce Mar. 14, 2023) (final results of antidumping duty administrative review; 2020–2021), PR 151,[1] and accompanying Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review; 2020-2021 (Mar. 7, 2023), PR 146; Light-Walled Rectangular Pipe and Tube from Mexico ("Amended Final

[1] Citations to the administrative record reflect the public administrative record ("PR"), confidential record ("CR"), public remand administrative record ("PRR"), and second public remand record ("SPRR") document numbers in this case, ECF Nos. 46, 47, 75, 76, 93 & 94.

Results"), 88 Fed. Reg. 30,723 (Dep't of Commerce May 12, 2023) (amended final results of antidumping duty administrative review; 2020-21), PR 160.

Before the Court are Commerce's Final Results of Redetermination Pursuant to Court Remand ("Second Remand Redetermination"), ECF No. 83-1, filed pursuant to the Court's remand order following the U.S. Court of Appeals for the Federal Circuit's ("CAFC") opinion in Marmen Inc. v. United States ("Marmen III"), 134 F.4th 1334 (Fed. Cir. 2025). See Second Remand Redetermination; Order (June 17, 2025), ECF No. 78; see also Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), ECF No. 61-1, PRR 7; Marmen Inc. v. United States ("Marmen I"), 45 CIT __, 545 F. Supp. 3d 1305 (2021); Marmen Inc. v. United States ("Marmen II"), 47 CIT __, 627 F. Supp. 3d 1312 (2023); Marmen Inc. v. United States ("Marmen IV"), 50 CIT __, No. 20-00169, 2026 WL 1726609 (June 15, 2026).

For the following reasons, the Court sustains the Second Remand Redetermination.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Second Remand Redetermination. See Maquilacero S.A. de C.V. et al. v. United States ("Maquilacero I"), 48 CIT __, 731 F. Supp. 3d 1346 (2024).

In October 2021, Commerce initiated an administrative review of light-walled rectangular pipe and tube from Mexico for the period covering August 1, 2020 through July 31, 2021. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 86 Fed. Reg. 55,811, 55,813 (Dep't of Commerce Oct. 7, 2021), PR 11. In the Amended Final Results, Commerce assigned a weighted-average dumping margin of 9.2% to Maquilacero S.A. de C.V. ("Maquilacero") and Tecnicas de Fluidos S.A. de C.V. ("TEFLU") and 5.32% to Perfiles LM, S.A. de C.V. ("Perfiles") (collectively, "Plaintiffs"). 88 Fed. Reg. at 30,724. Commerce utilized the Cohen's *d* test in its differential pricing analysis to calculate the dumping margins. See Remand Redetermination at 4. In Marmen III, the CAFC vacated and remanded Marmen II for Commerce to fashion a differential pricing analysis that did not rely on the Cohen's *d* test. 134 F.4th at 1343–48. After the Court remanded this case for further compliance with the CAFC's mandate in Marmen III, Commerce discontinued its use of the Cohen's *d* test and reformulated its differential pricing analysis to consist of three steps: (1) a new "price difference test" in place of the prior Cohen's *d* test; (2) the "ratio test;" and (3) the "meaningful difference test." Second Remand Redetermination at 5–9. Commerce's new analysis revised the margin calculations for Maquilacero and TEFLU, which resulted in weighted-average dumping margins of 10.67% for

Maquilacero and TEFLU, and 6.06% for the non-selected parties such as Perfiles. Id. at 3.

## JURISDICTION

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final results of an administrative review of an antidumping duty order. The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). The Court also reviews determinations made on remand for compliance with the Court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States ("Ad Hoc Shrimp"), 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

To comply with the CAFC's opinion in Marmen III, Commerce discontinued its use of the Cohen's *d* test and replaced it with a new "price difference test" for evaluating whether price differences are significant among purchasers, regions, or time periods, which is the first step of Commerce's differential pricing analysis. Second Remand Redetermination at 4–5. Commerce adopted the "price difference test" as step one of its differential pricing analysis in the Second Remand Redetermination as follows:

> The differential pricing analysis used here examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (i.e., ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POR based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.
>
> In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region or time period is within two percent of the weighted average net price to all other purchasers, regions or time periods. If the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test.
>
> Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the [period of review]. If 33 percent or less of the total value of sales passes the price difference test, then the results of

> the price difference and ratio tests do not support consideration of the A-to-T method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the [period of review]. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.
>
> If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

Id. at 7–9.

Commerce determined that 98.12% of the value of U.S. sales for Maquilacero and TEFLU passed the price difference test. Id. at 9. Commerce determined that this percentage confirmed the existence of a pattern of prices that differed significantly among purchasers, regions, or time periods. Id. In the Second Remand Redetermination, Commerce

determined that the A-to-A method could not account for such differences "because the weighted-average dumping margin crosse[d] the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method." Id. Accordingly, Commerce applied the A-to-T method to calculate the weighted-average dumping margins for both Maquilacero and TEFLU. Id.

## I. Reasonableness of Commerce's Differential Pricing Analysis

As a threshold issue, Perfiles asserts that the correct standard of review for Commerce's interpretation of 19 U.S.C. § 1677f-1(d)(1)(B), and thus Commerce's differential pricing analysis, is not reasonableness but whether the interpretation accords with the statute in light of Loper Bright Enters. v. Raimondo ("Loper Bright"), 603 U.S. 369 (2024). See Pl. Perfiles Comments Opp'n Final Redetermination Remand ("Consol. Pl.'s Br.") at 6–7, ECF No. 88. Defendant United States ("Defendant" or "Government") claims that the standard of review for Commerce's differential pricing analysis is reasonableness, and notes the CAFC's use of the reasonableness standard after Loper Bright in Marmen III when reviewing the analysis. Def.'s Comments Supp. Remand Redetermination ("Def.'s Br.") at 11–12 & 15, ECF No. 92 (citing Marmen III, 134 F.4th at 1348).

The relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness. See Stupp Corp. v. United States

("Stupp"), 5 F.4th 1341, 1353 (Fed. Cir. 2021) ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence.") (citing Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662, 667 (Fed. Cir. 2019) ("In carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints."); Apex Frozen Foods Priv. Ltd. v. United States ("Apex Frozen Foods"), 862 F.3d 1337, 1346 (Fed. Cir. 2017) (holding Commerce's "meaningful difference" test to be "reasonable")). Further, the CAFC applied a "reasonableness" standard in evaluating whether it was "unreasonable for Commerce to use [the] Cohen's *d* test as part of its differential pricing analysis[.]" Marmen III, 134 F.4th at 1345. Accordingly, the Court reviews Commerce's Second Remand Redetermination and its "price difference test" under the reasonableness standard.

Commerce shall determine whether subject merchandise is being sold at less than fair value:

> (i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or
>
> (ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

19 U.S.C. § 1677f-1(d)(1)(A). Section 1677f-1(d)(1)(B) provides an exception, when Commerce:

> may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
>
> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

Id. § 1677f-1(d)(1)(B).

Congress implemented subsection (d) to address the concern that the A-to-A method for calculating dumping margins "could conceal 'targeted dumping.'" Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–83 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4177–78 ("SAA"). Under subsection (d), Commerce is allowed to calculate dumping margins using the A-to-T method in situations when the A-to-A method "cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, i.e., where targeted dumping may be occurring[,]" but only after Commerce first "establish[es] and provide[s] an explanation why it cannot account for such differences through the use of [the A-to-A method]." Id. at 4178 (emphasis omitted). The SAA provides that "Commerce will proceed on a

case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." Id. "The rationale behind that statutory exception is that targeted dumping is more likely to be occurring when export prices fit a pricing model that differs significantly among different periods of time, different purchasers, or different regions of the United States." Stupp, 5 F.4th at 1345 (citing Apex Frozen Foods, 862 F.3d at 1347).

Plaintiffs argue that a 2% threshold in the price difference test does not measure "significant" price differences as contemplated by 19 U.S.C. § 1677f-1(d)(1)(B). Pls.' Maquilacero & Tecnicas De Fluidos Comments Opp'n Second Remand Redetermination ("Pls.' Br.") at 17–21, ECF Nos. 89, 90; Consol. Pl.'s Br. at 16–18. Plaintiffs contend that Commerce's consideration of a significant price difference to be prices that differ by more than 2% ignores the context in which prices exist. Pls.' Br. at 17–19; Consol. Pl.'s Br. at 16–18. Perfiles claims that the ordinary meaning of "pattern" requires that Commerce ensure that the observed price differences are not random and reflect a pattern. Consol. Pl.'s Br. at 8–9. Maquilacero and TEFLU further claim that dictionary definitions of "significant" as meaning "important or noticeable" indicate that the 2% threshold falls short of the statute's requirements. Pls.' Br. at 17–18. In the Second Remand Redetermination, Commerce explained that:

> Commerce introduced the price difference test to determine whether prices for comparable merchandise differ significantly among

> purchasers, regions, or time periods. The price difference test does not stipulate an absolute value as a threshold (e.g., $5 per kilogram) but a threshold that measures relative differences (i.e., a percentage) on a case-by-case basis by a comparison to case- and product-specific averages dependent upon the customer, region, and temporal data provided by the respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration.

Second Remand Redetermination at 14. Commerce justified applying this *de minimis* standard because a 2% threshold is used by Commerce in other contexts. Id. at 15–17 (referring to the arm's-length test under 19 C.F.R. § 351.403(c) and the *de minimis* threshold for estimated weighted-average dumping margins under 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4)). Plaintiffs assert that Commerce's 2% threshold is not validated by its use in other contexts such as the arm's-length test and the *de minimis* standard, because the statute requires a case-by-case analysis whereas the other tests derive their thresholds from statutes. See Pls.' Br. at 20; Consol. Pl.'s Br. at 17. Plaintiffs claim that this "does not . . . account for price variations specific to the market in question." Consol. Pl.'s Br. at 13; see also Pls.' Br. at 15–17. The Second Remand Redetermination explains how the new methodology specifically considers relative differences in prices within the U.S. market for the respondent's merchandise across multiple categories, i.e., purchasers, regions, time periods, as opposed to applying an absolute or brightline threshold. Second Remand Redetermination at 14. The 2% threshold provides a

consistent metric for measuring the price differences, which allows for case-by-case variation. Id.

Plaintiffs argue additionally that the legislature's case-by-case basis directive[2] is not honored in Commerce's 2% threshold and that Commerce rejected previously a 2% test of this nature. Pls.' Br. at 7–14, 18–19; Consol. Pl.'s Br. at 12. Plaintiffs note that in a previous case, Commerce rejected the 2% test and explained that such a brightline threshold ". . . does not adequately account for price variations specific to the market in question." Consol. Pl.'s Br. at 12 (quoting Certain Steel Nails from the People's Republic of China, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008) (notice of final determination of sales at not less than fair value), and accompanying Issues and Decision Memorandum for the Investigation of Certain Steel Nails from the People's Republic of China, A-520-802 at Comment 7, (June 6, 2008)); Pls.' Br. at 11. Commerce explained that the "Nails Test" referred to by Plaintiffs was derived from the P/2 test, and was replaced with a methodology called the "differential pricing analysis." Second Remand Redetermination at 13–15. "The only common aspect of

[2] "[I]n determining whether a pattern of significant price differences exist[,] Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 842–83,1994 U.S.C.C.A.N. at 4178.

the P/2 test and the price difference test is the two percent threshold." Id. at 15.[3]

The CAFC has affirmed Commerce's use of the *de minimis* threshold in another part of the differential pricing test, the "meaningful difference test." See Apex Frozen Foods, 862 F.3d at 1346 ("[W]e agree that the difference in the actual antidumping rates that would be assessed—below *de minimis* when calculated with the [A-to-A] methodology; above *de minimis* when calculated using an alternative methodology—indeed informs the question of whether the [A-to-A] methodology can adequately account for a pattern of significant price differences 'because [A-to-A] masked the dumping that was occurring as revealed by the [A-to-T] calculated margin.'") (quoting Apex Frozen Foods Priv. Ltd. v. United States, 40 CIT __, __, 144 F. Supp. 3d 1308, 1333 n.24 (2016)). Based upon the explanation offered by Commerce in the Second Remand Redetermination and the CAFC's Opinion in Marmen III, the Court concludes that Commerce's adoption of the 2% threshold in the first stage of its differential

[3] "However, the P/2 test only examines whether prices to alleged 'targets' are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales." Second Remand Redetermination at 15.

pricing analysis in the new "price difference test" is reasonable and complies with Marmen III.

Maquilacero and TEFLU argue that Commerce failed to provide an adequate explanation for its determination regarding significant price differences. Pls.' Br. at 15–17. Maquilacero and TEFLU claim that Commerce's determination that Maquilacero/TEFLU's pricing variations represent targeted dumping is not supported by substantial evidence because Commerce failed to address evidence linking the price differences to costs of manufacturing, rather than targeted dumping. Id. at 15–17. For the Preliminary Results, Commerce determined that "over a 12-month period," the changes in Maquilacero and TEFLU's costs of manufacturing were "significant enough to warrant a departure from [Commerce's] standard annual costing approach." Mem. From K. Clahane to The File, re: Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V.'s Analysis Mem. Prelim. Results (Aug. 31, 2022) ("Prelim. Results Analysis Mem.") at 15, PR 112, CR 202; see also Light-Walled Rectangular Pipe and Tube From Mexico, 87 Fed. Reg. 54965 (Dep't of Commerce Sep. 8, 2022) (preliminary results and partial rescission of the antidumping duty administrative review; 2020–2021), PR 111, and accompanying Preliminary Decision Memorandum at 15–16, PR 103 ("Accordingly, a shorter cost-averaging period, based on a quarterly-average [cost of manufacturing], is appropriate for Maquilacero/TEFLU because we found

significant cost changes in [cost of manufacturing] as well as reasonable linkage between costs and sale prices.”). Defendant argues that these cost differences are irrelevant for Commerce’s new methodology, and that, “if anything, this is an implicit concession by Maquilacero that there was a pattern of prices that did indeed differ significantly.” Def.’s Br. at 19–20.

“Section 1677f–1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods.” JBF RAK LLC v. United States (“JBF RAK”), 790 F.3d 1358, 1368 (Fed. Cir. 2015). The CAFC has held that “requiring Commerce to determine the intent of a targeted dumping respondent ‘would create a tremendous burden on Commerce that is not required or suggested by the statute.’” JBF RAK, 790 F.3d at 1363, 1368 (citation omitted).[4] Commerce explained that a pattern of prices that differ significantly may indicate

---

[4] In JBF RAK LLC, the CAFC concluded that: “Section 1677f–1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, nor does it mandate which comparison methods Commerce must use in administrative reviews. As a result, Commerce looks to its practices in antidumping duty investigations for guidance. Here, the CIT did not err in finding there is no intent requirement in the statute, and we agree with the CIT that requiring Commerce to determine the intent of a targeted dumping respondent ‘would create a tremendous burden on Commerce that is not required or suggested by the statute.’” 790 F.3d at 1368 (internal quotation marks and citation omitted).

masked dumping, and that the meaningful difference test is what measures the amount of masked dumping that the A-to-A method cannot account for. See Second Remand Redetermination at 6–7. Although Commerce preliminarily determined that differences in costs of manufacturing were "significant enough to warrant a departure from [Commerce's] standard annual costing approach," Prelim. Results Analysis Mem. at 15, Commerce applied a new methodology in the Second Remand Redetermination and Commerce was not required by the statute nor the price difference test or ratio test to determine why the prices differ significantly.

Moreover, Perfiles argues that the ratio test was not upheld by the CAFC in Stupp and was insufficient to establish that a pattern of price differences existed. Consol. Pl.'s Br. at 14. Perfiles claims that the CAFC's decision only addressed the reasonableness of the 33% and 66% thresholds as a "policy choice," but not as tools to identify true patterns in price differences. Id. at 14–15. In Stupp, the CAFC held "that Commerce's ratio test reasonably implements the statutory requirement that Commerce determine whether there is 'a pattern of export prices' 'differ[ing] significantly among purchasers, regions, or periods of time' before selecting the average-to-transaction method." 5 F.4th at 1355 (citing 19 U.S.C.

§ 1677f-1(d)(1)(B)(i)). The ratio test was before the CAFC in Stupp, 5 F.4th at 1355, and the CAFC did not hold that the ratio test was unreasonable.

Perfiles also argues that Commerce should apply a statistical, "effect-size test" to determine if a pattern of prices exists. Consol. Pl.'s Br. at 11–12. Defendant argues that 19 U.S.C. § 1677f-1(d)(1)(B) does not require Commerce to employ statistical tests. Def.'s Br. at 23. Defendant argues that Perfiles' argument relies upon evidence from statistics textbooks that was not previously in the record. Def.'s Br. at 23–24. Because those documents were not on the record before Commerce and not considered by Commerce in the underlying proceeding, the Court may not consider them now. See 19 C.F.R. § 351.104(a)(3)(i) ("Documents not originating with [Commerce] must be placed on the official record for the documents to be considered by [Commerce] in [Commerce]'s analysis and determination").

Plaintiffs contest Commerce's abandonment of the mixed methodology on remand as well. See Pls.' Br. at 22–23; Consol. Pl.'s Br. at 18–19. Maquilacero and TEFLU argue that Commerce's decision to discontinue the mixed methodology lacked the requisite explanation for abandoning a practice or policy, and unlawfully altered the ratio test. Pls.' Br. at 22–23. Perfiles claims further that Commerce's elimination of the mixed methodology was beyond the scope of the CAFC's remand order in

Marmen III. Consol. Pl.'s Br. at 18–19. The Second Remand Redetermination explained that the statute does not require Commerce to use a "mixed" method as an alternative comparison methodology. Second Remand Redetermination at 23. In Marmen III, the CAFC concluded that, on remand:

> Commerce may re-perform a differential pricing analysis, and that analysis may not rely on [the] Cohen's *d* test for data sets like those here. This conclusion, of course, does not preclude Commerce from fashioning and justifying a statistical analysis that uses some of the ideas underlying Cohen's analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue.

134 F.4th at 1348. The CAFC's decision permitted Commerce to utilize a different analysis. Commerce stated that "[w]hile the statute permits Commerce's previous policy that adopted a hybrid version of the A-to-A method and the A-to-T method," Section 1677f-1(d)(1)(B) "permits Commerce to use the A-to-T method when certain conditions . . . are satisfied." Second Remand Redetermination at 23.

Section 1677f-1(d)(1)(B) provides that Commerce may apply the A-to-T method, rather than the A-to-A method, if there is a pattern of export prices that differ significantly among purchasers, regions, or periods of time, so long as Commerce "explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii)." 19 U.S.C.

§ 1677f-1(d)(1)(B). The exception in Section 1677f-1(d) refers to determining margins through the A-to-A methodology or the A-to-T methodology and makes no reference to a "mixed method" when Commerce applies both. See id. § 1677f-1(d). This absence of statutory language referring to a mixed method supports Commerce's determination to discontinue the use of its "mixed method." Additionally, the SAA refers to the use of one methodology over the other, but makes no reference to the simultaneous application of the A-to-A method and the A-to-T method. See SAA at 842–843, 1994 U.S.C.C.A.N. at 4178.[5]

Relying on the statutory language and the legislative history, the Court concludes that Commerce permissibly revised its differential pricing analysis to discontinue use of the "mixed method" and to apply the "ratio test" in accordance with Marmen III. The Court observes that the CAFC has previously upheld the "ratio test" as a reasonable method for Commerce to implement the statutory requirement to determine whether there is a pattern of export prices that differ significantly among purchasers, regions, or periods of time. Stupp, 5 F.4th at 1355. The Court concludes that

---

[5] "New section 777A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an [A-to-A] or [T-to-T] methodology cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, *i.e.*, where targeted dumping may be occurring." SAA at 843, 1994 U.S.C.C.A.N. at 4178.

Commerce provided a reasonable explanation for abandoning the "mixed method" and applying the "ratio test," and that Commerce complied with the CAFC's Opinion in Marmen III. Ad Hoc Shrimp, 38 CIT at 730, 992 F. Supp. 2d at 1290. Because Commerce adequately explained how its methodology was reasonable, the Court holds that Commerce's application of the "ratio test" to determine the extent of the significant price differences of all U.S. sales as measured by the "price difference test" applied as a component of its differential pricing analysis is in accordance with law.

In summary, Commerce conducted the differential pricing analysis here in three steps: the new "price difference test," the "ratio test," and the "meaningful difference test." The CAFC has held previously that Commerce's "ratio test" "reasonably implements the statutory requirement that Commerce determine whether there is a 'pattern of export prices' 'differ[ing] significantly among purchasers, regions, or periods of time' before selecting the [A-to-T]." Stupp, 5 F.4th at 1355 (alteration in original) (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i)). The CAFC reasoned that the "ratio test" is a "conventional method for quantifying comparisons across discrete groups: counting the number of divergent sales prices, as identified by an effect-size test, and calculating the population percentage of those divergent sales prices." Id. at 1354. The CAFC further held that Commerce's selection of the 33% and the 66% cutoffs in the "ratio test" is

reasonable. Id. at 1354–55. The CAFC has also held that the "meaningful difference test," step three of the differential pricing analysis, is reasonable. Id. at 1356 (citing Apex Frozen Foods, 862 F.3d at 1348–49); see also Toyo Kohan Co., Ltd. v. United States, 50 CIT __, No. 24-00261, 2026 WL 1459170 (May 22, 2026) (sustaining Commerce's differential pricing analysis using the new "price difference test" instead of the Cohen's *d* test after Marmen III); Marmen IV, 50 CIT __, No. 20-00169, 2026 WL 1726609; Gov't of Canada et al. v. United States, 50 CIT __, No. 23-00187, 2026 WL 2161176 (July 27, 2026); Universal Tube & Plastic Indus. et al. v. United States, 50 CIT __, No. 23-00113, 2026 WL 2428416 (Aug. 19, 2026).

With respect to the new "price difference test" that replaced the Cohen's *d* test and is the first step in Commerce's differential pricing analysis, Commerce explained that the "price difference test" is intended to determine whether prices differ significantly among purchasers, regions, or time periods. Second Remand Redetermination at 4–5. Commerce stated that if average prices to an affiliated customer differ by at least 2% from market prices, then Commerce considers that 2% threshold to be a significant difference. Id. at 13–14. As noted above, the CAFC in Stupp held that Commerce's selection of statistical tests and numerical cutoffs must be reasonable. Stupp, 5 F.4th at 1353.

In Commerce's new "price difference test," Commerce determined that a 2% difference in pricing would be considered significant. Because Commerce applied the new "price difference test" on a case-by-case basis and determined that 98.12% of the value of U.S. sales for Maquilacero and TEFLU passed the "price difference test," Commerce reasonably determined that prices differed significantly. Second Remand Redetermination at 9. The Court concludes that Commerce's "price difference test" is reasonable and in accordance with law.

Plaintiffs also argue that Commerce unlawfully abandoned the mixed methodology. Pls.' Br. at 22–23; Consol. Pl.'s Br. at 18–19. The CAFC stated in Marmen III that Commerce could revisit its differential pricing analysis, which is what Commerce did on remand in this case. Marmen III, 134 F.4th at 1348 ("Commerce may re-perform a differential pricing analysis[.]"). The Court concludes that Commerce's determination to alter its "mixed method" within its differential pricing analysis was reasonable when refashioning a new analytical framework to implement 19 U.S.C. § 1677f-1(d)(1)(B).

**CONCLUSION**

For the foregoing reasons, Commerce's Second Remand Redetermination is sustained. Judgment will be entered accordingly.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated: September 14, 2026
New York, New York